Gerald YOUNG, Plaintiff,

v.

**LINCOLN NATIONAL CORPORATION,**
Defendant.

No. 1–95–CV–386.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Aug. 20, 1996.

Samuel L. Bolinger, Myers and Geisleman, Fort Wayne, IN, mediator.

Bobby A. Potters, Potters Law Firm, Indianapolis, IN, for plaintiff.

T. Russell Strunk, Warsco Brogan and Strunk, Fort Wayne, IN, for defendant.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

This matter comes before the Court[1] on the motion of the Defendant, Lincoln National Corporation ("Lincoln" or "the Defendant") for summary judgment, filed July 1, 1996. The Plaintiff, Gerald Young ("Young" or "the Plaintiff"), responded on July 23, 1996 and Lincoln replied on August 8, 1996. The case arises under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. For the reasons hereinafter stated, the motion will be GRANTED.

### II. FACTUAL AND PROCEDURAL HISTORY[2]

Young is a thirty-year Lincoln employee with a good track record who is currently sixty-two years old. Young Dep. at 16; Vaughan Aff. ¶ 5; Robertson Aff. ¶ 4; Young Aff. A ¶ 4. Originally hired in 1966 as a

Senior Tax Accountant, he was eventually promoted, in either 1978 or 1979, to Second Vice President and Director of Taxes, where he was the head of the Tax Department and was responsible for all of Lincoln's tax work. Young Dep. at 16–17, 21–22. In or around June 1992, he came under the supervision of Richard Vaughan ("Vaughan") when Vaughan became Lincoln's Chief Financial Officer ("CFO"). Id. at 53–54; Vaughan Aff. ¶ 3.

Between 1989 and 1994, annual tax filings and payments jumped from approximately $100 million to $300 to $400 million. See Reply Exhs. A, B. With this growth, Lincoln has experienced a correspondingly increasing need for proactive tax planning for Lincoln and its subsidiaries (essentially the Tax Department's clients or patrons). See Young Dep. at 22; Young Aff. A ¶¶ 8–9.

Beginning in July 1993, Young sought to have his position upgraded from Second Vice President and Director of Taxes to Vice President of Taxes. Young Dep. Exh. H. Such upgrades must be approved by Lincoln's "Executive Hay Committee" ("the Committee"). Vaughan Aff. ¶ 7. George Davis, a member of the Committee, told Young to update his job description and have it approved by Vaughan. Young Dep. Exh. H. Vaughan signed off on Young's draft only after Young "put[ ] in a reference to the policy and strategic aspects of the job."[3] Id.

Unfortunately for Young, proactive tax planning is his weakest area. Richard Robertson ("Robertson"), Young's supervisor

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636, all parties consenting.

2. In this case, the Plaintiff failed to submit a " 'Statement of Genuine Issues' setting forth ... all material facts as to which it is contended there exists a genuine issue necessary to be litigated." N.D.Ind.L.R. 7.1. Counsel for the Plaintiff should take heed of Waldridge v. American Hoechst Corp., 24 F.3d 918 (7th Cir.1994), in which the Seventh Circuit strictly construed S.D.Ind.Loc.R. 56.1, which is virtually identical to N.D.Ind.Loc.R. 56.1, and determined that it is the parties' obligation to highlight which issues of fact are in conflict, and that it is not the duty of the district court to "scour the record looking for factual disputes." Id. at 920–22. Here, even though the Court has nonetheless undertaken to

closely examine the record for fact issues, the Defendant still prevails.

3. The job description written by Young, and approved by Vaughan, declared the position's purpose as:

This position is responsible for setting corporate tax policy and strategies for [Lincoln] and its affiliates in its corporate role. This position also serves a dual role with overall responsibility for directing and managing the tax compliance function of Fort Wayne affiliates for federal, foreign and state tax returns and payments, along with coordinating and consolidating that of affiliates outside of Fort Wayne. Also serves as consultant and advisor to affiliates outside of Fort Wayne.
Reply Exh. B.

from 1979 through 1992, and Philip Rossman, a Lincoln officer who reported to Young from 1979 to 1994, thought that Young was a technically-oriented person but felt that he was poor at strategic planning. Robertson Aff. ¶ 4; Rossman Aff. ¶ 4. Several other Lincoln employees—including Lincoln's President and Chief Operating Officer, Robert Anker ("Anker"), and patrons of the Tax Department—similarly viewed Young's limited ability to engage in strategic tax planning. *See* Anker Aff. ¶ 5; McMeekin Aff. ¶ 4; Clark Aff. ¶ 4; Tyler Aff. ¶ 4. In fact, shortly after Vaughan became CFO in 1992, both Anker and William Tyler, a Lincoln employee and patron of the Tax Department, expressed their concerns to him. Anker Aff. ¶ 6; Tyler Aff. ¶ 5. As a result of Young's deficiency, Jack Hunter ("Hunter"), Lincoln's General Counsel, noticed that many of the Tax Department's patrons sought tax planning advice from Lincoln's Law Division Tax Section. Hunter Aff. ¶ 4.

Nevertheless, when Vaughan came on board as Young's supervisor, he increased the performance evaluation ratings that Young's previous supervisor had given him in the category of "Advise on tax issues" and one other area because, in Vaughan's judgment, Young warranted a higher rating. Young Dep. at 57–60; Vaughan Aff. ¶ 4, Exh. A.

In administering performance evaluations, Lincoln managers categorize and rate various portions of an employee's job on a scale of one to five.[4] *See* Exhs. D–5–8. These ratings suggest that Young was adept at filing tax returns for Lincoln, but that he was less adept at proactive tax planning. In 1989, he received a rating of 4.0 in the category of tax planning. Young Aff. B Exh. 42. However, his rating in this category decreased at the same time as the demand for this skill increased: From 1991–1994, his rating dropped to a 3.3, with an all-time low in

1993 of a 3.0. *See* Exhs. D–5–8. During the same time frame, his overall rating dropped from a 3.9 to a 3.65. *See id.* By contrast, during this period, Young consistently earned a 4.0 rating in the area of "filing of tax returns." *See id.* In the February 4, 1994 evaluation, Vaughan specifically stated "I am not satisfied with level of activity relative to innovative proposals for tax planning. However, main causes have been the divestitures in 1993; rating 3.3." Exh. D–8.

The next month, Vaughan and Young met to discuss succession planning and Vaughan specifically asked Young's age. Young Aff. A. ¶ 22. At some unspecified date but probably the first half of 1994, Vaughan noted to himself that "[w]hat makes this job V.P. is Tax Strategy. This is the area that is lagging. Carl Baker—[George Davis] to talk to Carl to see what risk we run with option to early retire [Young]." Vaughan Dep. at 66–67, Exh. D–15. In another set of undated notes, Vaughan wrote:

> Was Jerry offered early retirement through CORE or Workforce 92. Fred to check with list and [Ken Dunshire].
>
> Talk to Ian about direction. ([Young's] wife was Ian's tax accountant.)
>
> ⅔ of age discrimination are won by plaintiff.
>
> Attend staff meeting on periodic basis. 360–degree feedback.
>
> Tell [Young] he's not doing VP level work. Won't upgrade position. Think about package. Consultant role during audit. "What you aren't doing on job."

Vaughan Dep. at 68, Exh. 16. In deposition, Vaughan indicated that these notes stem from "[t]he fact that [Young's] age is something that we always have to worry about from a—you know, any time you're trying to get someone to take early retirement that is more senior, you have to be concerned with

---

**4.** In the area of tax planning, the possible ratings are as follows:

(5) Innovations proposed to substantially improve after-tax income. Evaluation of tax effect of proposals correct and complete.

(4) Innovations proposed to improve after-tax income. Evaluation of tax effect of proposals correct and complete.

(3) No significant innovations proposed. Evaluation of tax effect of proposals correct and complete.

(2) Evaluation of tax effect of proposals erroneous in some significant respects.

(1) Fails to make any meaningful contribution to tax planning.

*See, e.g.,* Exh. D–5.

age discrimination. So many lawyers out there today." Vaughan Dep. at 69.

In April 1994, the Committee voted to upgrade Young's position to the Vice President position ("the upgraded position"). Vaughan Aff. ¶ 9; Farkas Aff. ¶¶ 5–6. However, upon Anker's advice and after discussions with Lincoln's upper management, Vaughan, who had hiring authority, decided not to place Young in the upgraded position due to his limited ability to perform strategic tax planning ("the employment action"). Vaughan Aff. ¶¶ 10–11, 14; Exh. D–17; Young Dep. at 62–63.

On April 13, 1994, Vaughan informed Young of his decision and further explained that he would be conducting a search for an individual to fill the position. Vaughan Aff. ¶ 13. Vaughan offered, and Young refused, an early retirement package. Exh. D–17. Young compares hearing of this decision to "being hit in the head with a baseball bat" and believes that it was based on an impermissible factor—his age. Young Dep. at 68–69.

He is still employed as a Second Vice–President and currently serves as CFO of the Lincoln Foundation and Director of International Taxes. Young Dep. at 69–71. However, he considers the employment action to be a demotion—although he has experienced no decrease in his pay, benefits, or compensation—because his duties have "been shrunk. [He's] just one of the staff now." Id.; see Exhs. D–26–29.

After interviewing a number of candidates, Vaughan eventually chose Casey Trumble ("Trumble"), based in part on "his significant experience in providing tax planning to large insurance companies." Vaughan Aff. ¶¶ 14–15. When Trumble started work on October 31, 1994, he was forty years old. Exh. D–22. Since Trumble has come on board, the Tax Department's clients have reportedly been pleased with the increase in tax planning they have received from the Department. Whitney Aff. ¶ 4; see Clark Aff. ¶¶ 4–5, Tyler Aff. ¶¶ 5–6.

Within two days of the employment action, Young sought legal advice and was referred to a local attorney, Chris Myers ("Myers"), through the Allen County Bar Referral. Young Dep. at 74–75. The record is silent, however, as to the advice he received or whether Young had any further contact with Myers.

At any rate, on May 2, 1994, Young drove to the Equal Employment Opportunity Commission ("EEOC") office to file a charge of age discrimination. Young Aff. ¶ 19. He met with Edward Vance ("Vance"), an EEOC investigator. Id. ¶ 20. At the end of the meeting, Vance told him that there was nothing to be done until a younger individual was hired to replace Young. Id. ¶ 21. On October 4, Trumble's hiring was announced and seven days later, on October 11, 1994, Young filed his charge of discrimination at the EEOC. Id. ¶ 23; Young Dep. at 66, Exh. F.

The EEOC dismissed Young's charge on August 21, 1995 after its investigation rendered it unable to conclude that an ADEA violation had occurred. *See* Exh. L. Young filed his complaint on November 15, 1995.[5]

In support of the motion for summary judgment, Lincoln contends that Young's charge of discrimination was filed one day too late with the EEOC and that, at any rate, he has failed to rebut Lincoln's offered reason for not assigning him to the upgraded position—his limited ability to engage in strategic tax planning. In response, Young asserts that his charge was timely filed with the EEOC and that, even if it was not, the doctrine of equitable tolling renders his filing timely. In addition, Young argues that Lincoln's offered reasoning for its employment action is a mere pretext for age discrimination. Lincoln replies with several challenges to Young's offered evidence and, substantively, contests the applicability of equitable tolling and the notion that Young has established pretext. These arguments will be examined in turn.

## III. STANDARD OF REVIEW

█ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

---

5. More facts may be discussed *infra,* as the Court analyzes the pending motion.

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High Sch. Dist. No. 204*, 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir.1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *Guenin v. Sendra Corp.*, 700 F.Supp. 973, 974 (N.D.Ind.1988). In ruling on a summary judgment motion, the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence nor the credibility of witnesses. *Anderson*, 477 U.S. at 249–51, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Ill. Nat'l Bank*, 704 F.2d 361, 367 (7th Cir.1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed. R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First Nat'l Bank of Cicero v. Lewco Sec. Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

In any event, in employment discrimination matters, the standard on summary judgment is applied with "added rigor." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993). As the Seventh Circuit recently reiterated in *Robinson v. PPG In-*

*dustries, Inc.*, 23 F.3d 1159, 1162 (7th Cir. 1994), citing the standard set out in *Sarsha*:

> Summary judgment is appropriate only when the materials before the court demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues. Accordingly, we will affirm the decision of the district court only if, had the record before that court been the record of a complete trial, the defendant would have been entitled to a directed verdict.[6] [citations omitted].

## IV. ANALYSIS

The Court will address the timeliness issue first to determine whether the merits of the motion need to be addressed. Because the Court concludes that there is, at least, an issue of fact as to whether the doctrine of equitable tolling protects Young's filing (which, of course, is resolved in Young's favor for the purposes of this motion, *see Anderson*, 477 U.S. at 249–51, 106 S.Ct. at 2511), the motion's merits must be examined. Keeping in mind the "added rigor" required by *Sarsha*, 3 F.3d at 1038, the Court nonetheless concludes that the evidence is so one-sided that Lincoln must prevail as a matter of law. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

### A. Timeliness

 Whether Young timely filed his charge of discrimination with the EEOC depends, first, on when the limitations period began to run, and, second, on whether the limitations period was tolled after it started to run. As a prerequisite to suit under the ADEA, a plaintiff must first file a charge of discrimination with the EEOC. *See* 29 U.S.C. § 626(d). In Indiana, a plaintiff must file the charge within 180 days of the challenged employment action. *See* 29 U.S.C. § 626(d)(1); *Daugherity v. Traylor Bros., Inc.*, 970 F.2d 348, 350 n. 2 (7th Cir.1992)

(citations omitted); *Vaught v. R.R. Donnelley & Sons Co.*, 745 F.2d 407, 410 n. 2 (7th Cir.1984). Here, the Vaughan–Young interview occurred on April 13, 1994 and Young filed his charge of discrimination at the EEOC on October 11, 1994—181 days after the interview.

 Applying the "discovery rule" set forth in *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980), a Title VII case, to an ADEA case, the Seventh Circuit has explained how to determine when the statute of limitations begins to run:

> Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date—often the same, but sometimes later—on which the plaintiff discovers that he has been injured.... [The discovery rule] is read into statutes of limitations in federal-question cases ... in the absence of a contrary directive from Congress.

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir.1990), *cert. denied*, 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991) (citations omitted).

 Here, Young learned of his injury on April 13, 1994, when Vaughan unequivocally informed him that he would not be named to the upgraded position. Thus, the limitations period began to run on that date. *See Antos v. Bell & Howell Co.*, 891 F.Supp. 1281, 1287–88 (N.D.Ill.1995) (Application of the discovery rule resulted in the limitations period starting to run on the date the employer unequivocally informed the employee of the adverse employment action.). Moreover, as the *Ricks* Court noted, "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." 449 U.S. at 258, 101 S.Ct. at 504. Thus, the fact that the upgraded position was not actually filled until October 31, 1994 is immaterial to the accrual date. After all, there is no

---

**6.** The anachronistic term "directed verdict" is no longer used; rather, it has been more accurately retitled "Judgment as a Matter of Law." *See* Fed.R.Civ.P. 50(a). A defendant is entitled to

such a judgment if "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the plaintiff. *Id.*

question that Young suspected discrimination immediately after his April 13 interview with Vaughan since he consulted an attorney two days later and went to the EEOC intending to file a discrimination charge less than a month later. Young Dep. at 74–75; Young Aff. A ¶ 19. *See Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 268 (7th Cir.1995) ("[T]he limitations period begins to run when a reasonable person would believe he may have a cause of action.").

 Having established that the limitations period began to run on April 13, 1994, the next question becomes whether the 180-day limit may be tolled for equitable reasons. *See Cada*, 920 F.2d at 451–53 (examining the applicability of the doctrine of equitable tolling to the 180-day limit under the ADEA). Tolling is generally premised on plaintiff's "excusable neglect." *Anderson v. Unisys Corp.*, 47 F.3d 302, 306 (8th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 299, 133 L.Ed.2d 205 (1995); *see Mull v. ARCO Durethene Plastics, Inc.*, 784 F.2d 284, 291 (7th Cir.1986). Here, Young contends that limitations period should be tolled because the EEOC misled him into filing an untimely charge by telling him to wait until Lincoln hired someone for the upgraded position.[7] Equitable tolling is appropriate where the EEOC misleads a complainant into filing an untimely charge. *See, e.g., Early v. Bankers and Cas. Co.*, 959 F.2d 75, 80 (7th Cir.1992) ("Misleading conduct by the EEOC can be a basis for tolling the administrative statute of limitations [under the ADEA]."); *Anderson*, 47 F.3d at 306–07 (citing cases); *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 616

(10th Cir.1988); *Sarsha v. Sears, Roebuck & Co.*, 747 F.Supp. 454, 456 (N.D.Ill.1990); *Edwards v. G.D. Searle*, 1988 WL 96374 (N.D.Ill., Sept. 12, 1988). Here, therefore, equity calls for tolling the statute of limitations until Lincoln's October 4 hiring announcement.[8]

In Lincoln's view, equitable tolling is inappropriate on these facts because Young was purportedly "represented by an attorney." *See generally Wagher v. Guy's Foods, Inc.*, 768 F.Supp. 321, 324–26 (D.Kan.1991). "When a complainant has received legal advice, the courts have been disinclined to apply equitable tolling based upon the complainant's alleged ignorance of the law." *Petersen v. City of Wichita, Kan.*, 706 F.Supp. 766 (D.Kan.1989), *rev'd on other grounds*, 888 F.2d 1307 (10th Cir.1989).

 Here, however, there is at least an issue of fact as to whether Young actually was "represented by" or merely consulted an attorney. The record indicates that Young only met with Myers once before going to the EEOC. Young Dep. at 74–75. In fact, the record further suggests that neither Myers nor any other attorney represented Young: during deposition, Young was not even sure of Myers' last name, Young Dep. at 74; apparently, no attorney accompanied him to the EEOC, Young Aff. A Exh. 39; he told Vance in July 1995 that he may "contact an attorney for legal advice," Exh. BB at 3; and, there is no attorney listed on the EEOC's determination letter, Exh. L. Whereas it has been held that an EEOC error binds a

---

7. Lincoln challenges the admissibility of this statement, contending that it is inadmissible hearsay. It is only logical, however, that Young offers Vance's statement simply for the fact that it was made, and not for the truth of the matter asserted therein. *See* Fed.R.Evid. 801(c). Therefore, the hearsay objection is overruled. *See Bell v. City of Milwaukee*, 746 F.2d 1205, 1273–75 (7th Cir.1984) (deciding that, in context of civil rights action arising out of police shooting, evidence of racist comments by police was non-hearsay since the evidence was offered only to show that the comments were made, not to prove the truth of the matter asserted therein).

8. The Seventh Circuit held in *Cada* that "a plaintiff who invokes equitable tolling to suspend the statute of limitations must bring suit within a

reasonable time after he has obtained ... the necessary information." 920 F.2d at 453. In other words, the plaintiff is not necessarily "entitled to an automatic extension of the statute of limitations by the length of the tolling period or any other definite term.... [The doctrine] is, after all, an equitable doctrine. It gives the plaintiff extra time if he needs it." *Id.* at 452. Here, Young filed his charge of discrimination only four days after the hiring announcement was made and, wisely, Lincoln does not challenge whether Young acted within a reasonable amount of time. *See id.* at 453. Whereas an eight-month delay has been held unreasonable, *id.*, and a ten-month delay has been held unreasonable, *Thelen*, 64 F.3d at 268, a one-week lag can hardly be challenged on this basis.

complainant who is represented by counsel, see *Hamel v. Prudential Ins. Co.*, 640 F.Supp. 103, 105 (D.Mass.1986), the same cannot necessarily be said where a complainant merely consulted an attorney once before being misled by the EEOC (and the Court has been unable to locate any cases where this result occurred). Viewing the facts in a light most favorable to Young, there is at least an issue of fact as to whether equitable tolling should apply.

Having found at least an issue of fact as to whether the EEOC charge was timely filed, the Court now turns to the merits of the motion for summary judgment.

### B. The Present Motion for Summary Judgment

■■■■ To survive the present motion, Young must at least have raised an inference of discrimination. He attempts to do so under the familiar *McDonnell–Douglas* burden-shifting framework[9] since he presents no direct evidence of discrimination. *See Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7th Cir.1994); *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472 (7th Cir. 1993), *cert. denied*, 510 U.S. 959, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993). In applying the *McDonnell–Douglas* framework, "[t]o expedite the process, it may be preferable to get past the *prima facie* case and examine the pertinent issue of whether there was discrimination in a job action." *EEOC v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145, 150 (7th Cir.1996) (citing cases). Here, the Court will jump right to the third step of the process in order to expedite the analysis.[10] Hence, the question becomes whether Young has rebutted Lincoln's offered reason for the employment action—Young's limited ability to perform strategic tax planning. *See* Vaughan Aff. ¶¶ 10–11, 14; Exh. D–17; Young Dep. at 62–63.

■■■ Young does not even arguably establish that this offered reasoning is actually pretext for discrimination. "[P]retext ... means a lie, specifically a phony reason for some action." *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995). Essentially, he contends that he was qualified to perform the upgraded position because, as head of the Tax Department since 1968, strategic tax planning had consistently been part of his job, and, at any rate, it comprised only fifteen percent of his overall duties. *See* Young Dep. at 62.

■■■■ However, Young's own subjective opinion as to his qualifications does not create a genuine issue of material fact since the relevant inquiry concerns the *employer's* perception of Young's qualifications. *See Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir.1996) (citing cases); *Williams v. Williams Elec., Inc.*, 856 F.2d 920, 924 (7th Cir.1988); *Weihaupt v. American Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989). Moreover, whether or not Lincoln exercised good business judgment is immaterial; Young must show that Lincoln's offered reason is phony or unworthy of credence, *Courtney*, 42 F.3d at 418, 424 n. 4; *Pignato*, 14 F.3d at 349. Pretext "is a statement that

---

**9.** Under this formula, Young bears the initial burden of establishing by a preponderance of the evidence a *prima facie* case of discrimination. By doing so, he could create a rebuttable presumption of discrimination. *Anderson v. Baxter Healthcare Corp.*, 13 .F.3d 1120, 1122 (7th Cir. 1994). The burden then shifts to Lincoln to articulate a legitimate, nondiscriminatory reason for the challenged action. *Id.* If Lincoln is successful, the presumption dissolves, and the burden of production shifts back to Young, who must show that "a discriminatory motive more likely motivated [Lincoln's] decision or that [Lincoln's] proffered explanations are unworthy of credence." *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994); *see also id.* at 424 n. 4; *Saint Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–12, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 400 (7th Cir.1992). In other words, even if

Lincoln's proffered reason is irrational, Young must still show that it is "phony" to establish pretext. *See Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir.1994), *cert. denied*, —— U.S. ——, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994). If Young forms a *prima facie* case, and at least raises a reasonable inference that Lincoln's reason for the action was "phony," then an inference of discrimination arises and the issue must be presented to the trier of fact. *Courtney*, 42 F.3d at 424 n. 4 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 510–12, 113 S.Ct. at 2749).

**10.** Therefore, whether this case involves a claim for failure-to-promote or demotion is immaterial to the Court's conclusion. *See* Reply Br. at 5 n. 2.

does not describe the actual reasons for the decision. The employer need not have 'good' reasons, and a mistaken business decision is not on that account a 'pretext.'" *Mister v. Illinois Central Gulf R.R. Co.*, 832 F.2d 1427, 1435 (7th Cir.1987), *cert. denied*, 485 U.S. 1035, 108 S.Ct. 1597, 99 L.Ed.2d 911 (1988) (citation omitted); *see Williams*, 856 F.2d at 924 ("We determine only whether [the employer's] layoff decision actually involved an attempt to select employees on the basis of performance-related considerations and was genuinely and honestly made."); *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987) ("This Court does not sit as a super-personnel department that reexamines an entity's business decisions.").[11]

■ Young also challenges Lincoln's use of subjective criteria in performance evaluations, but such criteria are permissible. *See Jayasinghe v. Bethlehem Steel Corp.*, 760 F.2d 132, 135–36 (7th Cir.1985). While it is true that "evaluations based on subjective criteria ... are more susceptible to a showing of pretext," the dearth of evidence that the ranking system really masked age discrimination dooms Young's claim. *See Robinson v. PPG Indus.*, 23 F.3d 1159, 1164 (7th Cir.1994). Moreover, Lincoln documented the performance ratings with some specificity, which supported its offered rationale for denying Young the upgraded position. *See* Exhs. D–5–8.

Young further opines that Vaughan concocted a scheme to oust him. But, as Lincoln observes, if Vaughan, who was Young's immediate supervisor, wanted to "oust" him,

he could have fired him. Instead, Vaughan denied Young one job and assigned him to another, with no decrease in benefits, compensation, or salary. Young Dep. at 70; *see* Exhs. D–26–29.

■ In fact, as the incoming manager who had raised the previous manager's performance rating of Young,[12] it only stands to reason that Vaughan is entitled, by analogy, to the benefit of the "same actor" inference recognized in *EEOC*, 77 F.3d at 152, and *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1147 (7th Cir.1994) (citing, *inter alia*, *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991)). This inference has "strong presumptive value." *See EEOC*, 77 F.3d at 152. Both *EEOC* and *Rand* invoked *Proud's* reasoning that "in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." 945 F.2d at 797 (involving a six month time span); *see EEOC*, 77 F.3d at 152 (ten month time span); *Rand*, 42 F.3d at 1147 (two-year time span). The First Circuit relied on the same reasoning to find an inference of no discriminatory animus where the same actor promoted the plaintiff and then, less than two years later, terminated him. *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 847 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). Here, Vaughan raised Young's performance rating in or about July 1992 (when Young would have been fifty-nine years old), Young Dep. at 57–60; Vaughan Aff. ¶ 4, Exh. A, and then denied him the upgraded posi-

---

**11.** In fact, Lincoln's decision seems perfectly rational, given that it is essentially undisputed that strategic tax planning—Young's weakest area—was becoming more and more important. *See* Robertson Aff. ¶ 4; Rossman Aff. ¶ 4; Anker Aff. ¶¶ 5–6; McMeekin Aff. ¶ 4; Clark Aff. ¶ 4; Tyler Aff. ¶¶ 4–5; Hunter Aff. ¶ 4; Exhs. D–5–8; Young Aff. B Exh. 42; Young Dep. at 22; Young Aff. A ¶¶ 8–9; Reply Exhs. A, B. While Young contends that past solid performance in this area (including a rating of 4.0 in 1989) negated Lincoln's offered rationale for denying him the upgraded job, his ratings in this category were declining. In particular, Vaughan specifically advised Young in his 1994 evaluation, "I am not satisfied with level of activity relative to innova-

tive proposals for tax planning. However, main causes have been the divestitures in 1993; rating 3.3." Vaughan Aff. ¶ 6; Exh. D–8; *see* Exhs. D–5–8. Obviously, Young had performed adequately through the 1980s when Lincoln's tax situation was relatively straight-forward; with the 1990s, Lincoln's tax obligations grew, as did the opportunity for strategic tax planning—unfortunately, not Young's forte.

**12.** Significantly, Young does not feel that Robertson, the previous manager who gave him the lower rating, was biased against him because of age. *See* Young Dep. at 59.

tion less than two years later, in April 1994. Vaughan Aff. ¶ 13. It "seems rather suspect to claim that the [manager who raised his performance rating] 'had suddenly developed an aversion to older people' two years later." *Rand,* 42 F.3d at 1147 (quoting *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174–75 (8th Cir.1992)).

■■■ In sum, Young has utterly failed to show "specific evidence from which the finder of fact may reasonably infer that the employer's proffered reasons for the adverse job action do not represent the truth." *Dey v. Colt Const. & Dev. Co.,* 28 F.3d 1446, 1461 (7th Cir.1994) (emphasis added).

Young does point to the timing of certain events, possibly in an attempt to raise an inference of discrimination with evidence of "suspicious timing or inappropriate remarks." *Loyd v. Phillips Bros.,* 25 F.3d 518, 522 (7th Cir.1994); *see Troupe,* 20 F.3d at 736; *Wagner v. NutraSweet Co.,* 900 F.Supp. 959, 967 (N.D.Ill.1995). The most suspicious scenario Young can create is as follows: At the end of Young's February 1994 performance review, Vaughan told him to "keep up the good work," Young Dep. at 51, 54; the next month, during a succession planning meeting, Vaughan asked Young his age, Young Aff. A ¶ 22 (which, of course, was hardly a secret and something that easily could have been obtained from company records since Young had worked at Lincoln since 1966); moreover, at some unspecified date but probably during the first half of 1994, Vaughan noted to himself that Lincoln needed to consider "what risk" it ran by offering Young an early retirement package, Vaughan Dep. at 66–67, Exh. D–15; in addition, Vaughan had also noted to himself, in the context of offering early retirement to Young, that "⅔ of age discrimination are won by plaintiff[s]" Vaughan Dep. at 68, Exh. 16. In deposition, Vaughan indicated that Lincoln routinely considers the possibility of an ADEA suit when offering early retirement to a member of the protected class. Vaughan Dep. at 69. Young offers no evidence to the contrary.

■■■ Young can raise an inference of discrimination from suspicious timing by demonstrating a "convincing mosaic of discrimi-

nation." *See Troupe,* 20 F.3d at 737. This concept was illustrated in a recent Seventh Circuit case, *Piraino v. International Orientation Resources, Inc.,* 84 F.3d 270 (7th Cir. 1996), wherein the plaintiff, who alleged that she had been fired in violation of the Pregnancy Discrimination Amendment to Title VII, 42 U.S.C. § 2000e(k), *id.* at 271, survived summary judgment, *id.* at 276. Factually, when the plaintiff was hired in August 1990, the defendant-employer had no written leave policy. *See id.* at 272. One month later, she informed her employer that she was pregnant and was told that she and the company would work out a maternity leave. *Id.* At no time was the plaintiff informed of either an unwritten leave of absence policy, or a maternity leave policy. *Id.* Two months later (and a mere one month before the plaintiff took off work to have her baby), the company instituted a written leave of absence policy, and a maternity leave policy, each effective immediately, and each requiring one year's experience with the company. *Id.* Thus, the written policies rendered the plaintiff ineligible to take leave since she had only been working for the company for about three months. Some time in December, when she took off of work to have her baby, the plaintiff was told that she could re-apply to the company when she was ready to return to work, *id.*; however, the company never did re-hire her despite the fact that she made two attempts to return to her old job, *id.* at 273. The Seventh Circuit reasoned that this evidence allowed the plaintiff to create a mosaic of discrimination in that the suspicious timing of the adoption of the written policies, combined with some comments made to the plaintiff, created an inference of discrimination. *Id.* at 276.

■■■ Additionally, summary judgment has been denied where the timing of the act itself allows an inference of discrimination. *See, e.g., Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307 (7th Cir.1989) (plaintiff asserted that the defendant had retaliated against her for complaining about sexual harassment where, approximately one week after she complained, she received the lowest performance rating she had received in thirteen years with the company and was told that

her job would not be kept open during her maternity leave); *Franklin v. Minnesota Mining and Mfg. Co.,* 1994 WL 649120 (N.D.Ill., Nov. 10, 1994) (plaintiff asserted discrimination on the basis of failure to promote where four non-minorities had been accepted into a coveted training program, but when it was the plaintiff's turn to enter the program, it was canceled). *See also Giacoletto v. Amax Zinc Co., Inc.,* 954 F.2d 424 (7th Cir.1992) (jury verdict in favor of employee in age discrimination suit affirmed where, *inter alia,* plaintiff was fired a few weeks after he refused to take voluntary early retirement). Young falls far short of his required showing. He offers no evidence from which to infer discriminatory animus by Lincoln; rather, the record demonstrates only that Vaughan followed his normal routine of assessing the risk of an age discrimination suit in offering an early retirement package—a prudent course in this litigious age. Thus, Young fails to raise an inference of discrimination on the basis of suspicious timing.

 Finally, Young asserts, and Lincoln agrees, that every applicant interviewed for the upgraded position was younger than Young. Of course, that is hardly unlikely given that Young was sixty-one at the time. At any rate, to the extent that Young attempts to raise an inference of discrimination based on comparative evidence, the Seventh Circuit has recently addressed the required showing. In *Kuhn v. Ball State Univ.,* 78 F.3d 330 (7th Cir.1996), the plaintiff contended that he had been denied a promotion in violation of the ADEA and sought to invoke a statistical comparison in support of his claim of age discrimination, *id.* at 332. The Seventh Circuit rejected this argument:

> a plaintiff who wants a court to infer discrimination from the employer's treatment of comparable cases has to analyze a goodly sample.... What a plaintiff in [the plaintiff's] position has to do is subject all of the employer's decisions to statistical analysis to find out whether age makes a difference. Our opinions emphasize the need to get beyond a few comparison cases, ... and we cannot stress this point enough.

*Id.* (citing *Troupe,* 20 F.3d 734; *Bush v. Commonwealth Edison Co.,* 990 F.2d 928, 931–32 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1648, 128 L.Ed.2d 367). Here, Young offers no sound statistical comparisons.

For all of these reasons, Young has failed to meet his burden of persuasion, warranting summary judgment for Lincoln.

## V. CONCLUSION

For the foregoing reasons, Lincoln's motion for summary judgment is GRANTED. The Clerk is directed to enter judgment in favor of Lincoln.